**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| CRISTAL HATCH BLACK,<br><br>        Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security | **REPORT AND RECOMMENDATION**<br><br><br>2:17-cv-00153-JNP-EJF<br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Evelyn J. Furse |

Plaintiff Cristal Hatch Black filed this action asking this Court[1] to remand the final

agency decision denying her Disability Insurance Benefits and Social Security Income

under Titles II and XVI of the Social Security Act.  The Administrative Law Judge ("ALJ")

determined Ms. Black did not qualify as disabled within the meaning of the Social

Security Act.  (ECF No. 15, Tr. 37, the certified copy of the transcript of the entire record

of the administrative proceedings relating to Cristal Hatch Black (hereafter "Tr. __").)

Having carefully considered the parties' memoranda and the complete record in this

matter, the undersigned RECOMMENDS the District Judge REMAND the

Commissioner's decision because, in general, it fails to provide sufficient analysis to

permit Court review.[2]

---

[1] On March 17, 2017, Judge Parrish referred this case to the undersigned Magistrate
Judge under 28 U.S.C. § 636(b)(1)(B).  (ECF No. 4.)

[2] Pursuant to Civil Rule 7-1(f) of the Rules of Practice for the United States District Court
for the District of Utah, the undersigned does not need oral argument and will determine
the appeal on the basis of the written memoranda.

## STANDARD OF REVIEW

42 U.S.C. §§ 405(g) and 1383(c)(3) provide for judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA").  The Court reviews the Commissioner's decision to determine whether the record as a whole contains substantial evidence in support of the Commissioner's factual findings and whether the SSA applied the correct legal standards.  42 U.S.C. §405(g); Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007).  The Commissioner's findings shall stand if supported by substantial evidence.  42 U.S.C. §§ 405(g) and 1383(c)(3).

Adequate, relevant evidence that a reasonable mind might accept to support a conclusion constitutes substantial evidence, and "[e]vidence is insubstantial if it is overwhelmingly contradicted by other evidence."  O'Dell v. Shalala, 44 F.3d 855, 858 (10th Cir. 1994).[3]  The standard "requires more than a scintilla, but less than a preponderance."  Lax, 489 F.3d at 1084.  "Evidence is not substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion."  Gossett v. Bowen, 862 F.2d 802, 805 (10th Cir. 1988) (quoting Fulton v. Heckler, 760 F.2d 1052, 1055 (10th Cir. 1985)).  Moreover, "[a] finding of 'no substantial evidence' will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence."  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992) (quoting Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983)).

Although the reviewing court considers "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability

---

[3] Courts apply the same analysis in determining disability under Title II and Title XVI. See House v. Astrue, 500 F.3d 741, 742 n.2 (8th Cir. 2007).

cases," the court "will not reweigh the evidence or substitute [its] judgment for the Commissioner's," Lax, 489 F.3d at 1084 (quoting Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005)), but will "review only the sufficiency of the evidence," Oldham v. Astrue, 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original).  The court does not have to accept the Commissioner's findings mechanically but will "examine the record as a whole, including whatever in the record fairly detracts from the weight of the [Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test has been met."  Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800–01 (10th Cir.1991)).  "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence,'" and the court may not "'displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'"  Lax, 489 F.3d at 1084 (quoting Zoltanski v. FAA, 372 F.3d 1195, 1200 (10th Cir. 2004)).

In addition to a lack of substantial evidence, the court may reverse where the Commissioner uses the wrong legal standards or fails to demonstrate reliance on the correct legal standards.  See Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir. 1994); Thomson v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993); Andrade v. Sec'y of Health & Human Servs., 985 F.2d 1045, 1047 (10th Cir. 1993).

## APPLICABLE LAW AND SEQUENTIAL EVALUATION PROCESS

The Social Security Act ("Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Moreover, the Act considers an individual disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In determining whether a claimant qualifies as disabled within the meaning of the Act, the SSA employs a five-step sequential evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750-53 (10th Cir. 1988); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The five-step process requires the ALJ to consider whether:

(1) The claimant presently engages in substantial gainful activity;

(2) The claimant has a medically severe physical or mental impairment or impairments;

(3) The impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation which preclude substantial gainful activity;

(4) The impairment prevents the claimant from performing his or her past work; and

(5) The claimant possesses a residual functional capacity to perform other work in the national economy considering his or her age, education, and work experience.

20 C.F.R. §§ 404.1520, 416.920. The claimant has the initial burden of establishing the disability in the first four steps. Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989). At step five, the burden shifts to the Commissioner to show that the claimant retains the ability to perform other work existing in the national economy. Id.

## FACTUAL AND PROCEDURAL BACKGROUND

Born February 18, 1980, Ms. Cristal Hatch Black alleges that migraines, lower back pain, major depressive disorder, panic disorder with agoraphobia, chronic pain syndrome, abdominal pain and nausea, insomnia, fibromyalgia, and Raynaud's syndrome in her right hand render her disabled.  (Tr. 338, 474.)  Ms. Black graduated from high school and previously worked as a bridal assistant, receptionist, retail clerk, and server.  (Tr. 396, 412–18, 950.)

Ms. Black filed applications for Disability Insurance Benefits and Supplemental Security Income benefits on November 16, 2012, alleging an onset date of disability of August 31, 2005—a few months after she gave birth to her first child.  (Tr. 166, 338, 345–46.)  She moved to amend her onset date to March 8, 2010—the day she gave birth to her second child.  (Tr. 474, 346.)  Specifically, Ms. Black asserted this amended onset date coincides with complications following an epidural during labor.  (Tr. 474.)

Following a February 2015 administrative hearing (Tr. 92–142), an ALJ issued a fully favorable decision on March 30, 2015 finding Ms. Black disabled.  (Tr. 197-211.)  The ALJ found Ms. Black's severe impairments included migraine headaches, degenerative disc disease in the lumbar spine, abdominal pain (etiology unknown), fibromyalgia, major depressive disorder, panic disorder with agoraphobia, and pain disorder associated with both psychological factors and a general medical condition.  (Tr. 203.)  He also concluded that Ms. Black had the residual functional capacity ("RFC") to perform sedentary work with restrictions, including that she would have to lie down during the workday for more than one and a half hours to alleviate her pain, and that based on these limitations, no jobs existed in sufficient numbers in the national

economy that she could perform.  (Tr. 210–11.)  Upon a subsequent review, the

Appeals Council found substantial evidence did not support the March 2015 decision,

and it contained errors of law.  (Tr. 215.)  Accordingly, the Appeals Council vacated the

March 2015 decision and remanded this case for further proceedings.  (Tr. 212–20.)

Specifically, the Appeals Council instructed the ALJ to:

- Obtain additional evidence concerning Ms. Black's impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence;

- Further evaluate Ms. Black's subjective complaints and provide rationale in accordance with the disability regulations pertaining to the evaluation of symptoms;

- Further evaluate Ms. Black's alleged abdominal pain in accordance with Social Security Ruling 96-4p and alleged fibromyalgia pursuant to Social Security Ruling 12-2p;

- If necessary and available, obtain evidence from a medical expert to clarify the nature, severity and/or limiting effects of Ms. Black's impairments;

- Give further consideration to Ms. Black's maximum residual functional capacity and provide appropriate rationale with specific references to the evidence of record in support of the assessed limitations; and

- If warranted by the expanded record, obtain supplemental evidence from a vocational expert.

(Tr. 217–18.)

Ms. Black and her attorney appeared at a second administrative hearing in

February 2016, where a new ALJ heard testimony from Ms. Black and a vocational

expert.  (Tr. 44-91.)  On March 14, 2016, the ALJ issued an unfavorable decision finding

that Ms. Black was not disabled.  (Tr. 16–37.)  The ALJ's opinion followed the five-step

sequential evaluation process.  (Id.)  At step one, the ALJ found Ms. Black had not

6

engaged in substantial gainful activity since March 8, 2010, the alleged onset date of her disability.  (Tr. 22.)  At step two, the ALJ found Ms. Black's severe impairments included migraines, degenerative disc disease of the lumbar spine, major depressive disorder, panic with agoraphobia, and Raynaud's syndrome.  (Tr. 22.)  The ALJ stated, Ms. Black's "medical evidence of record shows that she has been diagnosed with fibromyalgia."  Id.  However, he determined that "those diagnoses do not satisfy the requirements of Social Security Rule 12-2p," and, therefore, found "that fibromyalgia is not a medically determinable impairment in this case."  (Id.)  The ALJ also concluded that "the medical evidence of record does not identify the cause of [Ms. Black's] abdominal pain," and, therefore, found that it is not "a medically determinable impairment."  (Id.)  At step three, the ALJ found Ms. Black did not have an impairment that met or medically equaled a listed impairment.  (Tr. 22–24.)  The ALJ then assessed the following RFC:

> After careful consideration of the entire record, I find that [Ms. Black] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the requirements of lifting/carrying/pushing/pulling would he accomplished with only the left hand.  Handling and fingering with the right hand would be limited to occasional.  In addition, this person would be limited to simple, routine, and repetitive tasks; in a work environment free of fast-paced production requirements; involving only simple, work-related decisions; and only occasional interaction with the public.  Lastly, this person would have an average of two unscheduled absences from work per mouth due to the effects of migraine headaches.

(Tr. 25–34.)

At step four, the ALJ concluded that Ms. Black was unable to perform past relevant work as a server, sales clerk, receptionist, or bridal assistant.  (Tr. 34.)  At step five, considering Ms. Black's age, education, work experience, and RFC, the ALJ found

that jobs existed in significant numbers in the national economy that she could perform. (Tr. 34–36.)  Specifically, the ALJ found she could perform the requirements of a surveillance-system monitor and that, given her RFC, Ms. Black could perform approximately 15,000 jobs available in the national economy.  (Id.)  Consequently, the ALJ found Ms. Black not disabled, and accordingly, denied her application for benefits. (Tr. 36–37.)

Ms. Black subsequently asked the Appeals Council to review the ALJ's decision. (Tr. 14–15.)  The Appeals Council denied Ms. Black's request for review, (Tr. 1–6), thereby rendering the ALJ's decision the Commissioner's final administrative decision for purposes of judicial review.  See 20 C.F.R. § 404.981 (explaining effect of Appeals Council denial).

## ANALYSIS

Ms. Black alleges the ALJ made numerous errors in denying her disability benefits and supplemental security income.  The undersigned addresses each of the alleged errors in turn.

### I.    Fibromyalgia and Abdominal Pain Evaluation

Ms. Black asserts the ALJ erred in evaluating her fibromyalgia and abdominal pain at step two, which also led to additional errors at later steps.  (ECF No. 16 at 17– 18; ECF No. 21 at 1–3.)  She contends the ALJ's minimal discussion of these conditions fails to meet the Appeals Council's remand requiring an analysis and does not allow the Court to review the ALJ's decision meaningfully.  (Id.)  The undersigned agrees.

Step two of the sequential evaluation process requires the ALJ to decide whether the claimant has a severe impairment.  20 C.F.R. §§ 404.1520(a)(4)(ii),

416.920(a)(4)(ii).  An impairment or combination of impairments qualifies as severe when it significantly limits a person's physical or mental ability to do basic work activities.  20 C.F.R. §§ 404.1521(a), 416.921(a).  If the ALJ finds no severe impairments at step two the inquiry ends, and the ALJ finds the claimant not disabled.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the ALJ finds <u>any </u>impairment severe, the inquiry continues.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Subsequently, in determining the RFC, the ALJ considers all medically determinable impairments, including non-severe impairments.  20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).

By way of background, "[f]ibromyalgia, previously called fibrositis, is 'a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments and other tissue.'"  <u>Brown v. Barnhart</u>, 182 F. App'x 771, 773 n.1 (10th Cir. 2006) (unpublished) (quoting <u>Benecke v. Barnhart</u>, 379 F.3d 587, 589 (9th Cir. 2004)).  "It is a chronic condition, causing 'long-term but variable levels of muscle and joint pain, stiffness and fatigue.'"  <u>Id.</u> (quoting <u>Brosnahan v. Barnhart</u>, 336 F.3d 671, 672 n.1 (8th Cir. 2003)).  A claimant can establish that she has a medically determinable impairment of fibromyalgia by providing evidence from a licensed physician.  Soc. Sec. Ruling ("SSR") 12-2p, <u>Titles II and XVI: Evaluation of Fibromyalgia</u>, 2012 WL 3104869, at *2 (July 25, 2012).  A physician must support a diagnosis of fibromyalgia with evidence meeting the criteria of either the 1990 ACR Criteria for the Classification of Fibromyalgia (set forth in Section I.A.) or the 2010 ACR Preliminary Diagnostic Criteria (set forth in Section II.A.).  <u>Id.</u>, at *2.  Section I.A states

that the ALJ may find a claimant has a medically determinable impairment of fibromyalgia if the claimant has all three of the following:

(1) A history of widespread pain that has persisted for at least three months (the pain may fluctuate and not always be present);

(2) At least 11 positive tender points on physical examination (found on all quadrants of the body); and

(3) Evidence that other disorders that could cause the symptoms or signs were excluded.

Id., at *2–*3.

Section II.A. allows the ALJ to find a medically determinable impairment of fibromyalgia if the claimant meets the first and third prongs of the Section I.A. test, and instead of the positive tender points, has repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, in particular, fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome.  SSR 12-2p, 2012 WL 3104869, at *3.

"Signs" include "muscle pain, irritable bowel syndrome, fatigue or tiredness, thinking or remembering problems, muscle weakness, headache, pain or cramps in the abdomen, numbness or tingling, dizziness, insomnia, depression, constipation, pain in the upper abdomen, nausea, nervousness, chest pain, blurred vision, fever, diarrhea, dry mouth, itching, wheezing, Raynaud's phenomenon, hives or welts, ringing in the ears, vomiting, heartburn, oral ulcers, loss of taste, change in taste, seizures, dry eyes, shortness of breath, loss of appetite, rash, sun sensitivity, hearing difficulties, easy bruising, hair loss, frequent urination, or bladder spasms."  SSR 12-2p, 2012 WL 3104869, at *3 n.9.  "Co-occurring conditions" include irritable bowel syndrome, depression, "anxiety disorder, chronic fatigue syndrome, irritable bladder syndrome,

10

interstitial cystitis, temporomandibular joint disorder, gastroesophageal reflux disorder, migraine, or restless leg syndrome." Id., at *3 n.10.

At step two of the sequential evaluation process, the ALJ found Ms. Black had severe impairments consisting of migraines, degenerative disc disease of the lumbar spine, major depressive disorder, panic with agoraphobia, and Raynaud's syndrome. (Tr. 22.)  With respect to fibromyalgia, the ALJ stated:

> The claimant's medical evidence of record shows that she has been diagnosed with fibromyalgia.  (Exh. 1F/34-35; 13F/2, 5). However, those diagnoses do not satisfy the requirements of Social Security Ruling 12-2p. Accordingly, I find that fibromyalgia is not a medically determinable impairment in this case.

(Id.)

The ALJ did not explain his conclusion that Ms. Black's fibromyalgia diagnoses do not meet the requirements of SSR 12-2p.  In addition, the ALJ concluded Ms. Black's abdominal pain did not constitute a medically determinable impairment.  (Tr. 22.)  He noted that Ms. Black testified she experienced abdominal pain but did not know the cause, that the "medical evidence of record does not identify the cause of [Ms. Black's] abdominal pain," that the abdominal pain was a symptom, and that "no symptom by itself can establish the existence of [a medically determinable] impairment."  (Id.)  While true that a symptom does not constitute a medically determinable impairment, the ALJ did not acknowledge that abdominal pain is a symptom of fibromyalgia as set forth in SSR 12-2p, which is a medically determinable impairment.  Given the lack of analysis, whether the ALJ considered the symptom of abdominal pain in determining whether fibromyalgia qualified as a medically determinable impairment in this case remains unclear.

The ALJ's lack of discussion and analysis does not comply with the Appeals Council's mandate to evaluate Ms. Black's fibromyalgia and abdominal pain claims. Significantly, the ALJ's decision does not allow the undersigned the opportunity to assess whether the ALJ considered all relevant evidence, whether the relevant evidence supports the ALJ's decision, or whether he applied the correct standards to arrive at that conclusion, necessitating remand. See Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996) ("[B]are conclusion[s] [are] beyond meaningful judicial review."); Gilbert v. Astrue, 231 F. App'x 778, 784 (10th Cir. 2007) (unpublished) (remanding case for further proceedings where "the record [] fail[ed] to demonstrate that the ALJ considered all of the evidence with respect to [the claimant's] fibromyalgia."); Mizell v. Colvin, No. 13-1206-JWL, 2014 WL 6453592, at *2–*4 (D. Kan. Nov. 17, 2014) (unpublished) (remanding case for further consideration where the ALJ failed to explain adequately the bases for his decision that the claimant's fibromyalgia was not a medically determinable impairment).

Later in the ALJ's decision, he "noted that there was no medical exam to confirm [Ms. Black's] alleged fibromyalgia, and the doctors were not able to find exams with sufficient tender points documented." (Tr. 30.) Ms. Black argues, however, that her medical records contain evidence that meets SSR 12-2p's criteria. (ECF No. 16 at 17.) She points to medical records noting multiple tender points, (see, e.g., Tr. 597 ("Multiple tender points in a fibromyalgia type distribution"), Tr. 859–61 ("diffuse muscle tender points")), though concedes that Section I.A requires that the number and location of tender points be stated. (ECF No. 16 at 17.) However, Ms. Black correctly notes that SSR 12-2p allows the ALJ may to use the criteria in Section II.B. to determine a

medically determinable impairment of fibromyalgia "if the case record does not include a report of the results of tender-point testing, or the report does not describe the number and location on the body of the positive tender points." SSR 12-2p, 2012 WL 3104869, at *3 n.6. Ms. Black cites to medical records which she claims show repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions: muscle pain (Tr. 594, 597, 601, 613, 623), irritable bowel syndrome (Tr. 597), fatigue or tiredness (Tr. 597, 968), thinking or remembering problems (Tr. 597, 1011–16), headache (Tr. 611, 613, 784), pain or cramps in the abdomen (Tr. 578, 579, 597, 613), insomnia (Tr. 594, 613), depression (Tr. 597), nausea (Tr. 613), Raynaud's phenomenon (Tr. 1086, 1096, 1101, 1105, 1115, 1119), and loss of appetite (Tr. 1038). The Commissioner counters that most of the treatment notes date from 2005 through 2008, before the alleged onset of her disability, and that to the extent she cites evidence from the "relevant time period," her symptoms largely resulted from other conditions. (ECF No. 18 at 7).

As an initial matter, the Commissioner's argument that Ms. Black's medical records pre-dating the alleged disability onset date lack relevance fails. The medical records Ms. Black cites form part of her case record, and the ALJ should consider them in determining whether she qualifies as disabled. See 42 U.S.C. § 423(d)(5)(B) ("[T]he Commissioner . . . shall consider all evidence available in [an] individual's case record . . ."); 20 C.F.R. §§ 404.1527(c), 416.927(c) (requiring Commission to evaluate every medical opinion received); Hamlin v. Barnhart, 365 F.3d 1208, 1223 n.15 (10th Cir. 2004) (holding that medical reports predating disability period "are nonetheless part of [the claimant's] case record, and should have been considered by the ALJ"). Further,

SSR 12-2p recognizes the importance of the "longitudinal record" of symptoms in fibromyalgia cases because "the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'"  SSR 12-2p, 2012 WL 3104869, at *6.

Additionally, enough record evidence exists to make the ALJ's failure to explain his evaluation of it harmful error.  Ms. Black's doctor diagnosed her with fibromyalgia. (Tr. 1063–67.)  At times, she exhibited "[m]ultiple tender points in a fibromyalgia distribution."  (Tr. 597, see also 861, 1066.)  The ALJ found three co-occurring conditions identified in SSR 12-2p—migraines, depression, and Raynaud's syndrome— severe impairments.  (Tr. 22.)  Additionally, Ms. Black exhibited multiple other symptoms delineated in SSR 12-2p, including but not limited to abdominal pain, (Tr. 597), anxiety, (Tr. 597, 664), restless leg syndrome, (Tr. 601), fatigue, (Tr. 601, 651), insomnia, (Tr. 601, 664).  Further, other testing including MRIs, CT scans, MS testing, GI workup, etc. came back normal.  (Tr. 1219-1223.)

Evidence also exists, as the Commissioner points out, suggesting that at least some of the symptoms may be attributable to conditions other than fibromyalgia.  (ECF No. 18 at 7–8.)  Unfortunately, the undersigned cannot resolve these issues given the ALJ's lack of analysis.  Whether fibromyalgia constitutes one of Ms. Black's medically determinable impairments under the criteria set forth in SSR 12-2p remains for the ALJ to review, determine, and explain on remand.

Finally, the Commissioner argues that even if the ALJ erred in assessing whether fibromyalgia is a medically determinable impairment, that error is harmless.  (ECF No. 18 at 8.)  The Commissioner correctly asserts that the failure to find a particular impairment severe at step two is not reversible error if the ALJ finds at least one other

impairment severe.  The Commissioner mistakenly argues that because the ALJ

"evaluated all of the record evidence in assessing [Ms. Black's] RFC and accounted for

the verifiable symptoms and limitations [she] asserted stemmed from all her conditions,

including her alleged fibromyalgia and abdominal pain" the error remains harmless.

(ECF No. 18 at 8.)  These arguments are unavailing.

First, the issue in this case is not that the ALJ failed to find fibromyalgia a severe

impairment.  The issue is the ALJ failed to find fibromyalgia a medically determinable

impairment at all.  The distinction is critical.  In formulating the RFC, an ALJ must

consider all medically determinable impairments, whether severe or not.  <u>See</u> 20 C.F.R.

§§ 404.1545(a)(2), 416.927(a)(2) ("We will consider all of your medically determinable

impairments of which we are aware, including your medically determinable impairments

that are not 'severe' . . . when we assess your residual functional capacity."); SSR 96-

8p, <u>Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims</u>, 1996 WL

374184, at *5 (July 2, 1996) (requiring ALJ to "consider limitations and restrictions

imposed by all of an individual's impairments, even those that are not 'severe.'").  But

the ALJ may only consider medically determinable impairments in assessing the RFC.

<u>See</u> SSR 96-8p, 1996 WL 374184, at *2 (ALJ "must consider only limitations and

restrictions attributable to medically determinable impairments.")  Thus, the ALJ was

supposed to disregard Ms. Black's fibromyalgia in determining her RFC.

If, as the Commissioner argues, the ALJ considered Ms. Black's fibromyalgia in

formulating the RFC after finding it not a medically determinable impairment, then he

erred.  However, the ALJ does not appear to have considered any limitations and

restrictions fibromyalgia may cause Ms. Black in assessing the RFC.  While the ALJ

15

recited medical reports that reference fibromyalgia, (Tr. 28, 29, 32), he did not specifically discuss any limitations or restrictions that may result from that condition. See Brown v. Colvin, 205 F. Supp. 3d 1269, 1274–75 (D. Kan. 2016) (finding error not harmless where the ALJ declined to find fibromyalgia a medically determinable impairment at step two, and "no evidence [showed] that Plaintiff's fibromyalgia was considered in the evaluation of Plaintiff's claim at any [later] step in the process."). Further, the ALJ discounted many of Ms. Black's claims about her limitations that he may not have discounted had he found she had fibromyalgia as a medically determinable impairment. Additionally, despite the Commissioner's contention that the ALJ considered Ms. Black's abdominal pain in assessing the RFC, the ALJ never mentioned abdominal pain again after finding it not medically determinable at step two.

The ALJ failed to explain the basis for his conclusion that Ms. Black's diagnosed fibromyalgia does not constitute a medically determinable impairment. As a result, the undersigned cannot evaluate the basis for his conclusion. The error is not harmless because enough record evidence exists making an analysis necessary, and if the ALJ did change his position, he would have had to consider fibromyalgia's effect on Ms. Black's RFC, which he did not. Therefore, the undersigned RECOMMENDS the District Judge remand the case so the ALJ can review the evidence relating to fibromyalgia and explain the bases for his findings. Furthermore, if upon remand, the ALJ deems fibromyalgia a medically determinable impairment, he must consider its impact in subsequent steps of the analysis.

## II.    Migraine Listing Analysis

Ms. Black also contends the ALJ erred at step three of the sequential evaluation

process by failing to explain his reasoning for finding her migraine headaches failed to

meet or equal any impairment in in Listing 11.00 et seq., and argues that the record

supports application of Listing 11.03.  (ECF No. 16 at 18–19.)  At step three, with

respect to migraine headaches, the ALJ found:

> Although there is no specific medical listings [sic] regarding migraine
> headaches, I evaluated that impairment under listing 11.00. However, the
> claimant's headaches did not meet or equal the necessary requirements
> or severity levels under any listing in 11.00.

(Tr. 23.)

Step three of the sequential evaluation process "asks whether any 'medically

severe impairment,' alone or in combination with other impairments," meets or equals

"any of a number of listed impairments so severe as to preclude 'substantial gainful

employment.'"  Fischer-Ross v. Barnhart, 431 F.3d 729, 731 (10th Cir. 2005).  If the

claimant's impairment(s) meets or equals the listing, the ALJ must find the impairment

conclusively disabling.  See 20 C.F.R. §§ 404.1520(d), 416.1920(d).  If the

impairment(s) does not meet or equal the listing, the claimant must establish at step

four that his impairment prevents him from performing work he previously performed.

See 20 C.F.R. §§ 404.1520(e), (f), 416.1920(e), (f).

Because no listing for migraine headaches exists, the ALJ was required to

compare his findings with those of "closely analogous listed impairments."  See 20

C.F.R. §§ 404.1526(b)(2), 416.926(b)(2).  The SSA's guidance in effect at the time of

the ALJ's decision provided that Listing 11.03 relating to non-conclusive epilepsy was

the most closely analogous listed impairment.  See SSA Program Operations Manual

(POMS) DI 2450.015(B)(7)(b) (former version, cited and quoted by Ms. Black, ECF No. 16 at 18);[4] see also Thomas v. Colvin, 69 F. Supp. 3d 1174, 1178 (D. Colo. 2014) ("Although there is no separate listing for migraines, the Commissioner has stated that the most analogous listing is section 11.03, which sets forth criteria for non-convulsive epilepsy.")

To medically equal the criteria of Listing 11.03, Ms. Black had to establish that her migraine headaches were

> documented by detailed description of a typical [migraine headache], including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 11.03.[5]  Further, the former POMS guidelines referencing Listing 11.03 provided the following example to illustrate how an ALJ makes an equivalence determination:

---

[4] The POMS is "a set of policies issued by the Administration to be used in processing claims." McNamar v. Apfel, 172 F.3d 764, 766 (10th Cir. 1999).  The current version of the POMS guidelines refer to Listing 11.02, but the prior version referred to Listing 11.03.  See Despinis v. Comm'r Soc. Sec. Admin., No. 2:16-CV-01373-HZ, 2017 WL 1927926, at *4 (D. Or. May 10, 2017) (unpublished).  "However, the narrative and description of symptoms that would equal the Epilepsy listing are the same in the revised version as the older version."  Id.

[5] This version of Listing 11.03 was in effect at the time the ALJ issued his decision on March 23, 2016.  Prior to September 29, 2016, Listing 11.03 covered non-convulsive epilepsy and Listing 11.02 covered conclusive epilepsy.  On September 29, 2016, the SSA combined these two "epilepsy" listings into one under Listing 11.02, thus removing Listing 11.03.  Revised Medical Criteria for Evaluating Neurological Disorders, 81 FR 43048-01, 2016 WL 3551949, at *43056 (July 1, 2016).  The final rule provides that this revised listing applies to "new applications filed on or after [September 29, 2016] and to claims that are pending on or after [that date]."  Id., at *43051.  Moreover, the SSA's final rule provides that it "expect[s] that Federal courts will review the Commissioner's final decisions using the rule that were [sic] in effect at the time [it] issued the decisions."  Id. at *43051 n.6.  Accordingly, the undersigned will apply the requirements of the prior

> A claimant has chronic migraine headaches for which she sees her treating doctor on a regular basis. Her symptoms include aura, alteration of awareness, and intense headache with throbbing and severe pain. She has nausea and photophobia and must lie down in a dark and quiet room for relief. Her headaches last anywhere from 4 to 72 hours and occur at least 2 times or more weekly. Due to all of her symptoms, she has difficulty performing her ADLs. The claimant takes medication as her doctor prescribes. The findings of the claimant's impairment are very similar to those of 11.03, Epilepsy, non-convulsive. Therefore, 11.03 is the most closely analogous listed impairment. Her findings are at least of equal medical significance as those of the most closely analogous listed impairment. Therefore, the claimant's impairment medically equals listing 11.03.

POMS DI 24505.015(B)(7)(b) (former version, cited by Ms. Black, ECF No. 16 at 18);[6]

see also Edwards v. Colvin, No. 3:14-CV-05338-KLS, 2014 WL 7156846, at *4 (W.D. Wash. Dec. 15, 2014) (unpublished) (quoting former POMS example regarding migraines).

The Commissioner argues that the ALJ adequately articulated the reasoning for his determination in his decision and that substantial evidence supports his findings. (ECF No. 18 at 9–10.)  In support of her argument, the Commissioner cites Fischer-Ross v. Barnhart, 431 F.3d 729 (10th Cir. 2005). (Id.)

In Fischer-Ross, the Commissioner appealed the district court's decision to remand a case based on insufficient findings at step three.  431 F.3d at 731. The ALJ made a conclusory finding that the claimant's combination of impairments did not meet or equal "'the criteria of any impairment listed in . . . the Listing of Impairments.'"  Id. at 732.  Despite the conclusory finding at step three and in reversing the district court's

---

Listing 11.03 in reviewing the ALJ's March 23, 2016 decision, which became the Commissioner's final decision at the time the Appeals Council denied review.

[6] Courts "defer to POMS provisions" unless they are arbitrary, capricious, or contrary to law.  Ramey v. Reinertson, 268 F.3d 955, 964 n.2 (10th Cir. 2001).

decision to remand the case, the court applied the ALJ's detailed findings at steps four and five to find the ALJ had made sufficient findings to support a denial of disability. See id. at 734–35.  The court explained that "an ALJ's findings at other steps of the sequential process may provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment," as the failure at step three results in "harmless error."  Id. at 733.  Harmless error occurs "where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way."  Id. at 733–34.

While the ALJ did not specifically explain at step three his conclusion that Ms. Black's migraines failed to meet or equal any impairment under Listing 11.00 et seq., his findings at other steps provide a proper basis for his conclusion, and substantial evidence supports them.  Thus, the ALJ's failure to explain the basis for his decision at step three proves harmless.  As the Commissioner points out, the ALJ found Ms. Black would have an average of two unscheduled absences per month due to the effects of migraine headaches.  (Tr. 25.)  The ALJ cited the report of Dr. Timothy Grange, Ms. Black's treating physician, who indicated that she suffered from migraines approximately twice per month which would place her in bed for two to four days .  (Tr. 30, 1138–39.)  Ms. Black also cites to this evidence in arguing that she meets Listing 11.03.  (ECF No. 16 at 19.)  Further, as Ms. Black points out, she testified during her hearing that after receiving Botox treatment, migraine headaches that would put her into bed decreased from seven to ten per month to two to three per month.  (Tr. 113–14.)

The ALJ also cited to Dr. Grange's note that Botox helps with her migraines.  (Tr. 30, 1140.)

Substantial evidence supports the ALJ's finding that Ms. Black does not meet the requirements of Listing 11.00 et seq.  To meet the requisite frequency requirement in Listing 11.03 relating to non-conclusive epilepsy—the most closely analogous listed impairment for migraines—her migraines would have to occur on a weekly basis or more often.  20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 11.03.  Furthermore, the POMS example identifies migraine headaches occurring twice per week as meeting Listing 11.03's frequency requirement.  POMS DI 24505.015(B)(7)(b).  The record indicates that with treatment, Ms. Black's migraine headaches occur approximately twice per month, not on a weekly basis or multiple times per week as required to meet Listing 11.03.  See Sullivan v. Zebley, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify.").  The ALJ adequately articulated later in his decision, after step three, the basis for his finding that Ms. Black's migraine headaches did not meet the requirements of Listing 11.00 et seq., and substantial evidence supports this decision.  Thus, the undersigned finds no error warranting remand on this basis.

Ms. Black also asserts "[h]er condition is sufficiently severe that she has lost weight to the point she would meet the applicable gastrointestinal issues."  (ECF No. 16 at 19.)  The Commissioner correctly points out that Ms. Black did not develop any argument on this point and failed to cite any authority.  (ECF No. 18 at 9.)  Accordingly, Ms. Black waived any arguments she may have with respect to Listing 5.0 et seq.

(digestive system).  See Eateries, Inc. v. J.R. Simplot Co., 346 F.3d 1225, 1232 (10th Cir. 2003) ("A party forfeits an issue it does not support with 'legal authority or argument.'" (quoting Clark v. State Farm Mut. Auto. Ins. Co., 319 F.3d 1234, 1244 (10th Cir. 2003)).

In her reply, Ms. Black raises a new argument—that her migraine headaches meet the frequency requirement in Listing 11.02.D.1, which the current version of the POMS guidance cites.  (ECF No. 21 at 4.)  Ms. Black acknowledges that the example indicates that migraine headaches would have to occur twice per week to meet the frequency requirement but argues that she meets the frequency requirement actually stated in Listing 11.02.D.1.  (ECF No. 21 at 4.)  First, Ms. Black cannot raise new arguments on reply; she waived any argument she failed to raise in her opening brief, and the undersigned will not address it.  See U.S. v. Harrell, 642 F.3d 907, 918 (10th Cir. 2011) ("[A]rguments raised for the first time in a reply brief are generally deemed waived."); Stump v. Gates, 211 F.3d 527, 533 (10th Cir. 2000) (noting court will not ordinarily review issues raised for the first time in reply brief).  Moreover, her argument relates to the current POMS guidelines not those in effect at the time the ALJ rendered his decision.  Ms. Black correctly cites to the applicable POMS language in her opening brief (ECF No. 16 at 18), but inexplicably cites to the current POMS guidance in her reply.  (ECF No. 21 at 4.)

Ms. Black also argues in her reply that "the equivalency analysis requires consideration of the combination of impairments," and the ALJ failed to discuss how some of her other symptoms would interact with limitations due to headaches.  (ECF

No. 21 at 5.)  Again, Ms. Black did not raise this argument in her opening brief, so the undersigned will not consider it here.

### III.    Residual Functional Capacity Analysis

Ms. Black also takes issue with a number of aspects of the ALJ's RFC assessment at step four.  The undersigned addresses each of these arguments in turn.

A claimant's RFC reflects the ability to do physical, mental, and other work activities on a sustained basis despite limitations from the claimant's impairments.  See 20 C.F.R. §§ 404.1545, 416.945.  The step-four analysis involves three phases:

> In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity (RFC), and in the second phase, he must determine the physical and mental demands of the claimant's past relevant work.  In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one.  At each of these phases, the ALJ must make specific findings.

Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003) (citation omitted).  In determining the claimant's RFC, the decision maker considers all of the claimant's medically determinable impairments, including those considered not "severe."  See 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).

### A.  RFC Development

Ms. Black claims that the ALJ erred "in first developing his RFC and then rejecting the evidence which may conflict with it."  (ECF No. 16 at 22.)  The Commissioner counters that the ALJ's decision follows the standard template, set forth in the heading the claimant's RFC and then discussing and weighing the evidence that led to the RFC finding.  (ECF No. 18 at 11.)

The ALJ's decision contains a nearly ten page analysis relating to the RFC formulation, discussing the evidence and the basis for his RFC findings.  (Tr. 25–34.) That the ALJ followed the standard decision template by listing the RFC in the heading and then proceeding to discuss the evidence that led to the RFC determination does not constitute reversible error.  See Romero v. Colvin, 563 F. App'x 618, 620 n.1 (10th Cir. 2014) (unpublished) (declining to reverse where the ALJ's decision, "in accord with the standard decision template, sets forth the RFC finding before discussing the factors that go into making that finding . . .")  The prior ALJ in this case followed the same standard template as well.  (Tr. 204–09.)  Thus, no reversible error exists in the way the ALJ set forth his RFC assessment.

### B.  Lack of Definitions

Ms. Black further argues the ALJ erred in failing to define "sedentary" work or "occasionally" in the RFC.  (ECF No. 16 at 20.)  Her argument lacks merit.  As the Commissioner points out, "sedentary work" and "occasionally" are terms of art in the Social Security context.  SSA regulations define "sedentary work" as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.   Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a) & 20 C.F.R. § 416.967(a); see also SSR 83-10, Titles II & XVI: Determining Capability to Do Other Work–The Medical-Vocational Rules of App. 2, 1983 WL 31251, at *5 (1983) (defining "sedentary work"); Department of Occupational Titles (DOT), App. C – Components of the Definition Trailer, 1991 WL 688702 (Rev. 1991) (same).  In addition, The SSA defines "occasionally" as an activity or condition

24

occurring up to one-third of the time.  SSR, 83-10, 1983 WL 31251, at *5; DOT, App. C, 1991 WL 688702.  As the SSA regulations and policies define these terms, the ALJ did not have to define them in his decision.

In her reply, Ms. Black raises another new argument—that the ALJ's RFC indicated "no fast paced production" but did not define the term.  (ECF No. 21 at 6.)  Ms. Black claims that without a definition, the Vocational Expert (VE) could not possibly assess whether a person with Ms. Black's limitations could maintain the pace proposed.  (ECF No. 21 at 6.)  Because Ms. Black did not raise this argument in her opening brief, she waived it, and the undersigned will not consider it.  See, e.g., Harrell, 642 F.3d at 918.  In any event, Ms. Black fails to point to any specific error that occurred in the RFC assessment or subsequent analysis because of the alleged failure to define "no fast paced production" specifically.

### C.  Concentration, Persistence, or Pace Limitations

Ms. Black asserts the ALJ erred in his RFC analysis because he did not include documented limitations on maintaining concentration, persistence, or pace.  (ECF No. 16 at 19.)  Ms. Black argues Dr. Joshua Clauson, a psychologist and medical consultant, concluded she had moderate limitations in maintaining attention and concentration for extended periods and in her ability to work in coordination with or in proximity to others without being distracted.  She further notes the ALJ found moderate limitations in concentration and persistence in his step three analysis but erroneously failed to account for those limitations in her RFC.  (Id. at 19–20.)  The Commissioner makes a lengthy argument concerning the different parts of Dr. Clauson's opinion and which ones control but does not address the ALJ's finding at step three that Ms. Black

had "moderate difficulties" with respect to concentration, persistence, or pace.  (Tr. 24.)

The undersigned disagrees with Ms. Black.

> At step 3, the ALJ, relying on Ms. Black's function report found the following:
>
> With regard to concentration, persistence or pace, the claimant has moderate difficulties.  The claimant stated on a function report completed on May 17, 2013, that she needed to be reminded on when to take her medications and that she did not finish things that she started (Exh. 8E/3, 6).  The claimant also stated that depending on her medications it was hard for her to pay attention.  She further stated that she was okay at following written instructions, but she would have to read them a few times to get it right (Exh. 8E/6).  Therefore, the claimant has moderate difficulties with regard to her concentration, persistence or pace.

(Tr. 24.)

In reaching his RFC, the ALJ again cites Ms. Black's function report stating that she needed reminding of when to take her medications, that household chores took her days, and that she had difficulty getting along with family members, friends, and neighbors.  (Tr. 33.)  The ALJ found Ms. Black's function report, which provided the basis for his limitation assessment at step three, supported Dr. Clauson's opinion, that Ms. Black has moderate difficulties with concentration, persistence, or pace.  (Id.)  After further analysis of Dr. Clauson's opinion in comparison to Ms. Black's function report (Form 3373 is found at Exhibit No. 8E of the administrative record, Tr. 419-426), the ALJ wrote:  "she retained the ability to do simple one and two step tasks in a low-social/public environment, which was also supported by her activities of daily living."  (Tr. 33.)  The RFC limits Ms. Black to "simple, routine, and repetitive tasks[,] in a work environment free of fast-paced production requirements[,] involving only simple, work related decisions[,] and only occasional interaction with the public."  (Tr. 25.)  These

limitations mirror the limitations the ALJ found supported by Ms. Black's function report, Dr. Clauson's opinion, and Ms. Black's activities of daily living.

In <u>Miranda v. Barnhart</u>, the Tenth Circuit remanded for further consideration a case where the ALJ found at step three that the claimant had "moderate difficulties" in maintaining concentration, persistence, or pace but did not address those factors in assessing the claimant's RFC or in posing hypothetical questions to the VE.  205 F. App'x 638, 643 (10th Cir. 2005) (unpublished).  The Tenth Circuit noted that while the ALJ found these moderate difficulties at step three in evaluating the listing for the claimant's mental impairments, the ALJ "did not further mention concentration, persistence, or pace—characteristics that would appear to be crucial factors in the type of work that the ALJ believed [the claimant] was capable of doing (one– or two-step jobs that require minimal supervision or interaction with co-workers)."  <u>Id.</u>  The court concluded, "[i]t does not appear that the ALJ ever made a firm determination regarding restrictions in these areas, and no such restrictions were included in the RFC or the first hypothetical question to the VE."  <u>Id.</u>

By contrast, the ALJ in this case did discuss Ms. Black's mental limitations and accommodated them in the RFC.  Indeed, the ALJ followed the Tenth Circuit's instructions "not [to] state a mental RFC in terms of the four functional areas, but [to] make a function-by-function assessment of each of the work-related mental activities relevant to the case at hand."  <u>See</u> <u>Catlin v. Colvin</u>, No. 12-1474-JWL, 2014 WL 2922403, at *3 (D. Kan. June 27, 2014) (unpublished); <u>see also</u> <u>Sawyer v. Astrue</u>, No. 08-2114-KHV, 2009 WL 634666, at *5 (D. Kan. Mar. 11, 2009) (unpublished) (finding ALJ "should make a function-by-function assessment of each of the work-related mental

activities relevant to the case at hand").  The ALJ's assessment addresses the issues of following instructions, involvement with people, and limited memory.  Therefore, the undersigned finds no error in the ALJ's explanation of his findings and conclusions concerning Ms. Black's limitations in maintaining concentration, persistence, or pace, and the impact of those limitations on Ms. Black's RFC assessment.

In her reply, Ms. Black raises a new argument—that a restriction to simple, routine work does not account for her fatigue.  (ECF No. 21 at 6.)  As she did not raise this argument in her opening brief, she waived it, and the undersigned will not consider it.  See, e.g., Harrell, 642 F.3d at 918.

### IV.    Medical Opinion Analysis

Ms. Black makes two primary arguments concerning the ALJ's analysis of the medical opinions in this case.  First, she argues that the ALJ's overall evaluation of the medical opinions is inconsistent and incomplete.  (ECF No. 16 at 20–22.)  Second, Ms. Black contends the ALJ did not properly consider and evaluate the opinion of Ms. Black's treating physician, Dr. Timothy Grange, and relatedly, erred in his consideration of Ms. Black's daily activities, which the ALJ used in part to discount Dr. Grange's opinions.  (Id. at 21–24.)  The undersigned agrees that the ALJ erred in his consideration and evaluation of medical opinions and Ms. Black's daily activities.

An ALJ must evaluate every medical opinion.  20 C.F.R. §§ 404.1527(c), 416.927(c).  If the ALJ finds a treating physician's opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [] not inconsistent with the other substantial evidence in [the] case record," the ALJ must give the opinion controlling weight.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  When the ALJ does not

give a treating physician's opinion controlling weight, the ALJ must consider the following factors in deciding the weight to give the treating physician's opinion, as well as other medical opinions:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

Watkins v. Barnhart, 350 F.3d 1297, 1300–01 (10th Cir. 2003) (citation omitted); see also 20 C.F.R. §§ 404.1527(c), 416.927(c).  "The ALJ must 'give good reasons' in the notice of determination or opinion for the weight that is given the treating physician's opinion."  Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003) (quoting 20 C.F.R. § 416.927(d)(2)).  If the ALJ rejects a medical opinion, he must offer "'specific, legitimate reasons'" for doing so.  Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001) (quoting Miller v. Chater, 99 F.3d 972, 976 (10th Cir. 1996); see also Doyal, 331 F.3d at 764 (ALJ must "provide specific, legitimate reasons for rejecting" opinion of non-treating physician).

The ALJ's decision need not "apply expressly each of the six relevant factors in deciding what weight to give a medical opinion."  Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007).  When considering medical opinion evidence, the ALJ must weigh and resolve evidentiary conflicts and inconsistencies.  See Richardson v. Perales, 402 U.S. 389, 399 (1971) (reflecting the ALJ's duty to resolve conflicting medical evidence).  The court may not supply possible reasons for assigning the weight

the ALJ did and may only evaluate the ALJ's decision on the stated reasons.  Robinson

v. Barnhart, 366 F.3d 1078, 1084–85 (10th Cir. 2004).

### A.  Medical Opinions Generally

Ms. Black first asserts that the ALJ's discussion of the medical opinions in

general is inconsistent and that he failed to perform the required analysis with respect to

those opinions.  (ECF No. 16 at 20–22.)  For example, Ms. Black claims the ALJ's

analysis of the opinions of Disability Determination Services physicians William

Backlund, M.D. and Gerald Rothstein, M.D. is contradictory because he finds the

opinions "well supported by explanation and by the medical evidence" but accords them

only "partial weight."  (Id. at 20–21.)  Ms. Black further asserts that the ALJ failed to

conduct the required analysis with respect to Drs. Backlund and Rothstein's opinions as

required by 20 C.F.R. § 404.1527(c).[7]  (ECF No. 16 at 21.)

The ALJ discussed the substance of Drs. Backlund and Rothstein's opinions.

Before according the opinions partial weight, the ALJ compared them to Ms. Black's

own statements about her abilities and found their limitations consistent with the ADLs.

To that degree, the undersigned can follow the ALJ's analysis.  However, the ALJ then

notes that these doctors found Ms. Black could perform work at level that exceeded the

ALJ's determined RFC and apparently for that reason gives them only partial weight.

(Tr. 29–30.)

Certainly, an ALJ's decision need not "apply expressly each of the six relevant

factors in deciding what weight to give a medical opinion."  Oldham, 509 F.3d at 1258.

However, the opinion must explain why the ALJ rejected part of a physician's "RFC

---

[7] The undersigned addresses Ms. Black's same contention regarding the analysis of Dr.
Grange's opinion below.

assessment while appearing to adopt the others." Haga v. Astrue, 482 F.3d 1205, 1208 (10th Cir. 2007). The problem with the ALJ's analysis here is that it does the analysis backward. The ALJ states he has set the RFC and discounts the physicians' opinions to the extent they disagree. The regulations require the exact inverse analysis, however: determine the weight to give to the physicians' opinions and then determine the RFC. 20 C.F.R. §§ 404.1545(a)(3), 20 C.F.R. § 416.945(a)(3) (stating that in assessing RFC the SSA "will consider any statements about what you can still do that have been provided by medical sources whether or not they are based on formal medical examinations"); see Brown v. Astrue, No. , 2013 WL 12329338, at *10 (D. N.M. Sept. 30, 2013) (unpublished); Tessier v. Berryhill, No. 2:17-cv-143 DAK, 2018 WL 4004770, at *3 (D. Utah Jan. 12, 2018) (unpublished). Furthermore, while inverting the analysis, the ALJ neglects to articulate any of the 20 C.F.R. §§ 404.1527(c), 416.927(c) factors as a basis to reject any portion of the doctors' opinions. Nevertheless, these errors as to Drs. Backlund and Rothstein remain harmless because they found Ms. Black had a greater RFC than the ALJ found she has. Thus any error redounds to the benefit of Ms. Black.

Ms. Black also contrasts the ALJ's analysis of Dr. Michael Schreiner's opinion, which the ALJ said was "quite conclusory" but afforded "great weight" with the opinion of Dr. Grange, which the ALJ also found "quite conclusory" but afforded "little weight." (ECF No. 16 at 22.) After discussing the substance Dr. Schreiner's opinion, the ALJ explained that even though Dr. Shreiner's opinion was "quite conclusory" he accorded it great weight because it was "consistent with the record as whole." (Tr. 31.) Consistency with the record is one of the factors to consider in according weight to a

physician's opinion under 20 C.F.R. §§ 404.1527(c), 416.927(c).  The ALJ also found

Dr. Grange's opinion conclusory.  (Tr. 30.)  However, he found Dr. Grange's opinion

relied heavily on Ms. Black's self-reports, and given the ALJ's discounting of her self-

reporting, he also discounted Dr. Grange's opinion.  (Tr. 31, 25-26.)  The ALJ thus

offered a basis to distinguish his analysis of Dr. Shreiner's opinion from that of Dr.

Grange.  However, given the ALJ's failure to analyze Ms. Black's fibromyalgia

complaints appropriately, his analysis of her credibility and thus also of Dr. Grange's

opinion becomes suspect and subject to change on remand, once he views fibromyalgia

through the lens required by the Regulations.

 Relatedly, Ms. Black also argues that because the ALJ only accorded Drs.

Backlund and Rothstein's opinions partial weight and Dr. Grange's opinion little weight,

that he improperly developed the RFC without any expert medical opinion.  (ECF No. 16

at 22.)  As the Commissioner points out, Ms. Black cites to First Circuit authority to

support her argument that that an ALJ cannot make an RFC determination in the

absence of an expert medical opinion.  (ECF No. 12–13.)  The Tenth Circuit explained,

however, that "there is no requirement in the regulations for a direct correspondence

between an RFC finding and a specific medical opinion on the functional capacity in

question."  Chapo v. Astrue, 682 F.3d 1285, 1288 (10th Cir. 2012).  The determination

of RFC is an administrative assessment which is "based upon all the evidence in the

record, not only the relevant medical evidence."  Young v. Barnhart, 146 F. App'x 952,

955 (10th Cir. 2005).  Therefore, the Court finds no merit in Ms. Black's argument on

this point.

### B.  Treating Physician Opinion

Ms. Black also takes issue with the ALJ's evaluation of her treating physician's opinion.  The ALJ gave "little weight" to Dr. Grange's opinion.  (Tr. 30–31.)  He found Dr. Grange's February 2015 opinion "quite conclusory" and that he "provided very little explanation of the evidence relied on in forming that opinion."  (Tr. 30.)  He also accorded Dr. Grange's July 2015 opinion little weight because "there exist good reasons for questioning the reliability of the claimant's subjective complaints," and Dr. Grange "apparently relied quite heavily on the subjective report of the symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported."  (Tr. 31.)  As an initial matter, and as the Commissioner points out (ECF No. 18 at 13), Ms. Black misconstrues Tenth Circuit authority concerning the evaluation of a treating physician's opinion.  She asserts that a treating physician's opinion "is entitled to controlling weight, 'so long as it is not inconsistent with the other substantial evidence in the record.'"  (ECF No. 16 at 21 (quoting McGoffin v. Barnhart, 288 F.3d 1248, 1252 (10th Cir. 2002).)  However, McGoffin provides that the ALJ must give controlling weight to a treating physician's "well-supported opinion".  Indeed, SSA Regulations provide that an ALJ must give controlling weight to a treating physician's opinion that is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Robinson v. Barnhart, 366 F.3d 1078, 1082 (10th Cir. 2004) ("An ALJ must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. [] If the answer to this question is 'no,' then the inquiry at this

stage is complete.  If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record.  []  In other words, if the opinion is deficient in either of these respects, then it is not entitled to controlling weight." (internal citations and quotations omitted)).

Here, the ALJ found Dr. Grange's opinions did not meet this threshold inquiry. He gave "little weight" to Dr. Grange's February 2015 opinion, finding it "quite conclusory" and that he "provided very little explanation of the evidence relied on in forming that opinion."  (Tr. 30.)  While the ALJ did not specifically state that he found Dr. Grange's opinion not well-supported by medically acceptable clinical and laboratory diagnostic techniques, his decision makes clear that he so concluded.  The ALJ also accorded Dr. Grange's July 2015 opinion "little weight" because "there exist good reasons for questioning the reliability of the claimant's subjective complaints," and Dr. Grange "apparently relied quite heavily on the subjective report of the symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported."  (Tr. 31.)  The ALJ's opinion extensively documents the reasons he found Ms. Black's subjective complaints unreliable, which boil down to her complaints contradicting her self-reports regarding her activities of daily living, thus again reflecting inconsistency with other record evidence.  (Tr. 25–26.) Given these findings and the applicable law, the regulations do not require the ALJ to give Dr. Grange's opinion controlling weight.  See Robinson, 366 F.3d at 1082.

The regulations do, however, require the ALJ to consider the factors set forth in Watkins, 350 F.3d at 1300–01 and 20 C.F.R. §§ 404.1527(c) and 416.927(c) in determining the weight to afford Dr. Grange's opinion.  Further, an ALJ must 'give good

reasons' in the notice of determination or opinion for the weight that is given the treating physician's opinion." Doyal, 331 F.3d at 762 (quoting 20 C.F.R. § 416.927(d)(2)).  Ms. Black argues that the ALJ failed to discuss each of the factors set forth in 20 C.F.R. § 404.1527(c) in evaluating Dr. Grange's opinion.  As addressed above, the ALJ need not discuss each of the six factors.  Oldham, 509 F.3d at 1258.  The ALJ's decision notes that Dr. Grange is Ms. Black's treating physician and is board certified in Physical Medicine and Rehabilitation at Spine, Orthopedic and Pain Center.  (Tr. 30.)  In addition, the ALJ's analysis of Dr. Grange's opinion sets forth the weight he assigned to Dr. Grange's opinion and reasons for that weight (Tr. 30–31).  See Sitsler v. Astrue, 410 F. App'x 112, 119 (10th Cir. 2011) (unpublished) ("The question for this court is whether the ALJ's decision contains specific reasons that make clear the weight assigned to [a treating physician's] opinion and the reasons for that weight.").  Therefore, the ALJ did not err in his consideration of Dr. Grange's opinion in terms of the process he followed in analyzing the opinion.

However, the undersigned finds the ALJ's analysis of Dr. Grange's opinion substantively flawed.  The ALJ discounted Dr. Grange's opinion in part because Dr. Grange "apparently relied quite heavily on the subjective report of the symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported," and "there exist good reasons for questioning the reliability of the claimant's subjective complaints."  (Tr. 30.)  As the Commissioner points out, "[a]t the very core of the ALJ's RFC assessment was his finding that [Ms. Black's] subjective allegations were not entirely reliable because they were undermined by other evidence in the record."  (ECF No. 18 at 14.)  Specifically, the ALJ found that Ms.

Black's subjective complaints were not credible because of other statements she made

relating to her daily activities:

> The claimant stated on a function report completed on May 17, 2013, that her conditions affected her ability for lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, her memory, completing tasks, her concentration, and using her hands (Exh. 8E/6). The claimant further stated that she could not lift very much and she could not play with her children like she wanted to.  She also stated that she was not able to lift, stand or sit for long periods of time (Exh. 8E/1).  Despite these allegations, the claimant stated on the same function report that she took care of her two daughters, and she had no problems with getting dressed (Exh. 8E/2).  She further stated that she could prepare her own meals on a daily basis, and perform household chores, such as cleaning and doing the laundry (Exh. 8E/3).  The claimant stated that she could drive a car, go out alone and go shopping in stores for food and personal items (Exh. 8E/4).  The claimant also stated that she could pay bills, count change, handle a savings account and use a checkbook.  Additionally, the claimant testified that she home schooled one of her children.  The claimant has described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations, which weakens her credibility.

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(Tr. 25.)

"Credibility determinations are peculiarly the province of the finder of fact, and [a

court] will not upset such determinations when supported by substantial evidence."

Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (quoting Diaz v. Sec'y of Health &

Human Servs., 898 F.2d 774, 777 (10th Cir. 1990)).  "However, '[f]indings as to

credibility should be closely and affirmatively linked to substantial evidence and not just

a conclusion in the guise of findings.'"  Id. (quoting Huston v. Bowen, 838 F.2d 1125,

1133 (10th Cir. 1988)).

Here, substantial evidence does not support the ALJ's credibility determination—which led in part to his discounting Dr. Grange's opinion—because he mischaracterizes Ms. Black's activities to discredit her claims of disabling limitations.  For example, the ALJ's analysis states that Ms. Black "took care of her two daughters," "that she had no problems with getting dressed," that she "could prepare her own meals on a daily basis," that she could "perform household chores, such as cleaning and doing the laundry," that she "could drive a car," that she "could go out alone and go shopping in stores for food and personal items," and that she "could pay bills, count change, handle a savings account and use a checkbook."  (Tr. 25.)  The ALJ also stated that Ms. Black testified she homeschooled one of her children.  (Id.)

The ALJ's analysis omits all of the limitations and qualifications Ms. Black also reported.  For example, Ms. Black stated in her function report that she has "to do thing[s] a little at a time and rest in between because [she is] not able to do them at the pace [she] want[s] because of the pain and anxiety."  (Tr. 420.)  She also reported that while she prepares food daily since she has "two girls that need to be fed," her "meals are very simple" so that it "does not take too long," and she does "eat out [because] it is hard to stand and cook large meals."  (Tr. 421.)  She also stated that she does "try to clean and do laundry but most of the time it takes [her] days to do house hold [sic] chores," and that "sometimes they don't get done."  (Id.)  With respect to personal care, Ms. Black stated that while she can dress herself, bathing "take[s] longer" because of "depression and pain," that caring for her hair "takes . . . a lot longer," and that shaving "hurt[s] because of the bending."  (Tr. 420.)  Ms. Black also reported that while she does drive a car, she also "goes with [her] mom a lot because of [medications] and pain."  (Tr.

422.)  She also indicated that when she does go shopping "it does take awhile because of pain."  (Id.)  Ms. Black also stated that her husband that she is separated from "does come and help [her] a lot."  (Tr. 420.)  Further, with respect to homeschooling, Ms. Black testified that this activity consisted of sitting with her daughter in front of her computer and helping her if she needed it and that sometimes she had to sit or lay down on the couch "because it gets hard on her back to sit there."  (Tr. 51–52.)

The Tenth Circuit has repeatedly "criticized this form of selective and misleading evidentiary review, holding that an ALJ cannot use mischaracterizations of a claimant's activities to discredit his claims of disabling limitations."  Sitsler, 410 F. App'x at 117; see also Sisco v. U.S. Dep't of Health & Human Servs., 10 F.3d 739, 743, 746 (10th Cir. 1993) (remanding case where, among other things, "[t]he ALJ built his factual basis by taking Plaintiff's testimony out of context and selectively acknowledging parts of her statements while leaving important segments out.")

The ALJ's mischaracterization of Ms. Black's activities necessitates remand so that the ALJ can consider credibility in light of all of her activities and limitations, and the impact of that determination on the weight given to Dr. Grange's opinion.  See Sitsler, 410 F. App'x at 119 ("[B]ecause the ALJ tied his rejection of [the treating physician's] opinion to his flawed assessment of claimant's credibility, the ALJ's evaluation of the treating physician's opinion is likewise flawed.").

The undersigned does not take a position as to Ms. Black's credibility, as credibility falls within the province of the ALJ.  As the Commissioner points out (ECF No. 18 at 15 n.11), facts in the record exist—not even explicitly addressed by the ALJ—that may indicate Ms. Black engages in activities inconsistent with her claims of disability.

(<u>See</u>, <u>e.g.</u>, Tr. 1199 ("Said she was climbing into the bathtub while playing hide and seek and fell striking the left shin on the edge of the tub.").)  However, the ALJ cannot discount Ms. Black's credibility based on a mischaracterization of the record. Furthermore, "[o]n remand, the ALJ should keep in mind that 'sporadic performance of household tasks or work does not establish that a person is capable of engaging in substantial gainful activity.'"  <u>Krauser v. Astrue</u>, 638 F.3d 1324, 1333 (10th Cir. 2011) (quoting <u>Thompson v. Sullivan</u>, 987 F.2d 1482, 1490 (10th Cir.1993)); <u>see</u> <u>also</u> 20 C.F.R. §§ 404.1572(c), 416.972(c) ("[W]e do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity.").  Therefore, the undersigned RECOMMENDS the District Judge remand this case to the ALJ for further consideration consistent with this analysis.

## V.    Pain Analysis

Ms. Black also argues that the ALJ erred by failing to engage in the required pain analysis and failing to consider the applicable factors in assessing the credibility of her subjective pain reports.  (ECF No. 16 at 26.)  The Commissioner does not directly respond to the argument, instead asserting in a footnote that the Court "should decline to reweigh the evidence" because "a reasonable person could agree with the ALJ's finding that [Ms. Black's] daily activities undermined her claims of extreme limitations." (ECF No. 18 at 14 n.9.)  The undersigned agrees with Ms. Black that the ALJ erred in his analysis.

"A claimant's subjective allegation of pain is not sufficient in itself to establish disability."  <u>Thompson v. Sullivan</u>, 987 F.2d 1482, 1488 (10th Cir. 1993).  When

evaluating a claimant's evidence of pain, the Court considers: "(1) whether Claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a 'loose nexus' between the proven impairment and the Claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling." Musgrave v. Sullivan, 966 F.2d 1371, 1376 (10th Cir. 1992) (citing Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987)).

Once the ALJ finds the existence of a medically determinable impairment, the ALJ must then evaluate the intensity and persistence of the symptoms to determine how the symptoms limit the claimant's capacity for work. SSR 96-7p, Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 1996 WL 374186, at *2 (July 2, 1996). "For this purpose, whenever the individual's statement about the intensity, persistence, or functionally limiting effects of pain or other symptoms [is] not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." Id.; see also Bolan v. Barnhart, 212 F. Supp. 2d 1248, 1261 (D. Kan. 2002) (citing Thompson, 987 F.2d at 1488) ("If objective medical evidence shows a pain-producing impairment, the ALJ must then consider the claimant's allegations of severe pain and decide whether to believe them.").

When determining the credibility of a claimant's subjective reports of pain and other symptoms, an ALJ must consider several factors, including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

40

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3; see also Thompson, 987 F.2d at 1489 (stating in determining credibility of pain testimony, ALJ should consider factors such as "the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, [and] the nature of daily activities") (internal quotations and citations omitted); Wall v. Astrue, 561 F.3d 1048, 1068 (10th Cir. 2009) (identifying the "Luna [v. Bowen, 834 F.2d 161 (10th Cir. 1987)] credibility factors" used to assess a claimant's pain, including "(1) medication, (2) attempts to obtain relief, (3) frequent medical contacts, (4) description of her daily activities, and (5) credibility").

Generally, a long medical history demonstrating a claimant's attempts to seek treatment for pain or other symptoms and following the recommended treatment "lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements."  SSR 96-7p, 1996 WL 374186, at *7.

In this case, the ALJ found Ms. Black's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her]

statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Tr. 26.) Further, the ALJ concluded that Ms. Black "does experience some levels of pain . . . but only to the extent described in the residual functional capacity." (Tr. 34.) Because the ALJ found that the objective medical evidence did not support Ms. Black's statements about the intensity, persistence, or functionally limiting effects of her symptoms, he was required to evaluate Ms. Black's credibility regarding her pain and other symptoms based on the entire record. SSR 96-7p, 1996 WL 374186, at *2.

The ALJ found Ms. Black's complaints about pain not credible because she "described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. 26.) This Report and Recommendation describes some of the issues with the ALJ's conclusion in this regard above. In addition to those issues, daily activities provide just one source of evidence that an ALJ must consider when assessing the credibility of an individual's statements regarding her pain and other symptoms. See SSR 96-7p, 1996 WL 374186, at *3. The ALJ must also look at factors such as medication taken to alleviate pain, the extensiveness of the attempts to obtain pain relief, and the frequency of medical contacts. Id.; see also Thompson, 987 F.2d at 1489; Wall, 561 F.3d at 1068.

While the ALJ mentioned various medications Ms. Black took and certain attempts at pain relief, such as Botox treatments, there is no indication in the ALJ's decision that he considered these other factors in assessing her credibility. Further, ample record evidence exists with respect to these factors. For example, Ms. Black took multiple pain relief medications, such as Fioricet, Percoet, Endocet, and Ibuprofen.

42

(Tr. 660, 1152.)  She also tried various treatments to obtain pain relief, including blood patches and Botox for her headaches.  (Tr. 649, 977.)  Further, Ms. Black has an extensive medical history dating back to 2005, indicating she has had frequent contact with physicians regarding pain and other symptoms.

The ALJ's failure to consider these additional factors expressly in assessing Ms. Black's credibility constitutes error.  See Hardman v. Barnhart, 362 F.3d 676, 680 (10th Cir. 2004) ("It was error for the ALJ to fail to expressly consider claimant's persistent attempts to find relief from his pain, his willingness to try various treatments for his pain, and his frequent contact with physicians concerning his pain-related complaints.")  The undersigned, therefore, RECOMMENDS the District Court remand this case so the ALJ can consider the required factors in assessing the credibility of Ms. Black's statements regarding her pain and other symptoms.

Ms. Black also argues the ALJ failed to address the side effects of medications as required by SSR 16-3p.  (ECF No. 16.)  She does not develop this argument and does not explain what impact the ALJ's alleged failure to consider any purported side effects from her medications had on his analysis of her credibility.  The undersigned, therefore, does not address this argument.

## VI.    Third-Party Function Report

Ms. Black also contends the ALJ erred in his consideration of the third party function report that her mother, Robyn Chambers, completed.  (ECF No. 16 at 22–24.) Specifically, Ms. Black asserts the ALJ improperly dismissed Ms. Chambers's report in part because of "alleged bias" and also improperly used Ms. Black's daily activities in assessing the credibility of Ms. Chambers's report concerning her daughter's limitations.

(Id.)  The Commissioner counters in a footnote that the ALJ did not "affirmatively find bias" and that substantial evidence supports the ALJ's decision to accord little weight to Ms. Chambers's statements because the limitations identified conflicted with the activities Ms. Chambers said her daughter could perform.  (ECF No. 18 at 15 n.11.)

The undersigned agrees with Ms. Black that the ALJ erred.  While the ALJ may consider the relationship between the parties in assessing a third party function report, his analysis of Ms. Chambers's report suffers from the same problem as his analysis of Ms. Black's function report.  As with Ms. Black's function report, he mischaracterizes the content of Ms. Chambers's third party report.  Therefore, substantial evidence does not support his analysis.

SSR 06–03p contains the standard for evaluation of third party evidence, such as function reports or testimony from spouses, parents, friends, and neighbors.  SSR 06-03p, Titles II & XVI: Considering Opinions & Other Evidence from Sources Who Are Not "Acceptable Med. Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental & Nongovernmental Agencies, 2006 WL 2329939 (Aug. 9, 2006).[8] With respect to consideration of such evidence, SSR 06-03p provides that the ALJ may "appropriate[ly] . . . consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence."  Id. at *6.  The ALJ need not make specific written findings about each lay witness's credibility if his decision reflects he considered the evidence.  See Adams v. Chater, 93 F.3d 712, 715 (10th Cir. 1996).

---

[8] The SSA rescinded SSR 06-03p for claims filed on or after March 27, 2017. Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 82 FR 15263-01, 2017 WL 1105348 (Mar. 27, 2017).

In his decision, the ALJ made the following findings with respect to Ms.

Chambers's function report:

> The claimant's mother, Robyn Chambers, completed a Third Party Function Report on the claimant on May 14, 2013 (Exh. 5E/1). She stated that the claimant's conditions affected her ability lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, her memory, completing tasks, her concentration, her understanding, following instructions and using her hands (Exh. 5E/6). Mrs. Chambers stated that the claimant has had many illnesses through her life and her conditions have limited her ability to do what she needed to do as a wife and a mother, and it has changed the claimant's life (Exh. 5E/1). She further stated that mentally, the claimant also struggled with everyday capabilities. Despite these allegations, Mrs. Chambers stated on the same function report that the claimant took care of her two daughters, and pets (Exh. 5E/2). She also stated that the claimant could prepare her own meals on daily basis, for both her and her daughters, and that the claimant could drive a car (Exh. 5E/4). She stated that the claimant could go shopping in stores, pay bills, count change, handle a savings account and use a checkbook (Exh. 5E/4). Mrs. Chambers also stated that the claimant made crafts and that being outside and up in the mountains helped the claimant (Exh. 5E/5). She also stated that the claimant spent time with her family. The limitations determined by Mrs. Chambers are inconsistent with the physical activities that she stated that the claimant could perform. Furthermore, since, Mrs. Chambers is not medically trained to make exacting observations; the accuracy of the information provided is questionable. Moreover, by virtue of the relationship with the claimant, Mrs. Chambers cannot be considered a disinterested third party witness whose statements would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges. Therefore, I give little weight to the information provided by Mrs. Chambers.

(Tr. 33–34.)

As an initial matter, family relationships constitute an acceptable consideration in assessing third party function reports. See SSR 06-03p, 2006 WL 2329939, at *6 (stating "appropriate to consider . . . the nature and extent of the relationship" in assessing third party evidence). Thus, the ALJ did not err in assigning less weight to Ms. Chambers's report on this basis. However, the ALJ's finding that Ms. Chambers "is

not medically trained to make exacting observations," and, therefore, the "accuracy of the information provided is questionable," creates a problem.  SSA guidelines require the ALJ to consider all available evidence in the record, including information from lay witnesses, such as parents and spouses.  See SSR 06-03p, 2006 WL 2329939, at *1–2 ("[W]hen we make a determination or decision of disability, we will consider all of the available evidence in the individual's case record.  This includes . . . information from other 'non-medical sources' . . . [including] [s]pouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers.")  Thus, an ALJ must consider lay opinions in making a determination as to disability, and such opinions would generally not come from individuals "who are medically trained."  Hence, questioning the accuracy of the information on that basis alone would run counter to the requirement to consider them.  Of course the ALJ can give more weight to a doctor's diagnosis of a mental health impairment than a family member's diagnosis, but the ALJ did not make a comparative statement here.  He simply discounted the statement in total without any such qualifications.

More importantly, however, the ALJ erred in assessing the content of Ms. Chambers's third party report.  He mischaracterized the contents of the report, just as he did with Ms. Black's function report.  For example, the ALJ's analysis indicates that Ms. Chambers stated Ms. Black "took care of her two daughters, and pets," that Ms. Black "could prepare her own meals on daily basis, for both her and her daughters, and that [Ms. Black] could drive a car."  (Tr. 34.)  The ALJ also indicated that Ms. Chambers stated that Ms. Black "could go shopping in stores, pay bills, count change, handle a savings account and use a checkbook," that she "made crafts and that being outside

46

and up in the mountains helped [Ms. Black]." (Id.)  He also noted that Ms. Chambers indicated that Ms. Black "spent time with her family." (Id.)  The ALJ's decision did not, however, mention any of the limitations and qualifications that Ms. Chambers reported. She indicated that "most of the time" Ms. Black "get[s] up with her children and do[es] what she can a little at a time" and that there is "a lot of rest in between because of pain and fatigue." (Tr. 404.)  Ms. Chambers further added that Ms. Black "cares for her two little girls to the best of her abilities," and that Ms. Chambers "spend[s] time helping [Ms. Black] because of her pain and anxiety." (Id.)  She also indicated that one of Ms. Black's daughters helps care for their pets. (Id.)  With respect to food preparation, Ms. Chambers indicated that most meals are simple, Ms. Black orders fast food two to three times per week, that "she does a little at a time" in terms of meal preparation, and that "she [doesn't] move as fast and sometimes meals are late." (Tr. 405.)  With respect to driving and shopping Ms. Chambers stated that Ms. Black drives but that "most of the time she rides in the car with [Ms. Chambers] or someone else because of [medications]," and noted that they shop together for every day needs for the family. (Id.)  Ms. Chambers also stated that Ms. Black has to "sit down in the shower because of pain," that she has a hard time caring for her hair, and that "chores are hard for her to do each day," and "it takes a long time[] and a lot of the time never happens." (Tr. 404–05.)

The ALJ improperly mischaracterized Ms. Chambers's third party report to discount it.  While the ALJ could reasonably assign less weight to Ms. Chambers' third party function report, he cannot do so based on a mischaracterization of the report's contents.  Therefore, the undersigned RECOMMENDS the District Judge remand this

case so that the ALJ can consider the full content of the report and assess the report consistent with SSR 06-03p.  In addition, as noted above, the ALJ must keep in mind that the fact a claimant engages in some household tasks does not necessarily establish that the person does not qualify as disabled.  See Krauser, 638 F.3d at 1333 (10th Cir. 2011).  Furthermore, that a claimant engages in certain hobbies and spends time outside and with her family does not mean that she does not qualify as disabled. See Tate v. Colvin, No. 15-4870-SAC, 2016 WL 4679942, at *4 (D. Kan. Sept. 7, 2016) (unpublished) ("[I]t is well-settled law that a claimant need not prove she is bedridden or completely helpless to be found disabled.") (citing Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005)).

### VII.    Significant Jobs in the National Economy

Once the claimant demonstrates that her impairments prevent her from engaging in past relevant work, the burden shifts at step five to the Commissioner to demonstrate "that the claimant retains the . . . (RFC) to do other work that exists in the national economy."  Thompson v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993).  To meet this burden, the ALJ must prove, with substantial evidence, that the claimant can work at a level lower than her past relevant work on a daily basis.  Id. at 1491.  The ALJ may not rely on the absence of evidence as substantial evidence because doing so "effectively shifts the burden back to the claimant."  Id. at 1491.

At step five of the sequential evaluation process, the ALJ determines whether the claimant can perform other work existing in significant numbers in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(v), 20 C.F.R. § 416.920(a)(4)(v).  The ALJ may determine that a sufficient number of jobs exist by relying on the testimony of a VE, (20

48

C.F.R. §§ 404.1566(e), 416.966(e)), or by relying on the Medical Vocational Guidelines, 20 C.F.R. §§ 404.1566(d), 416.966(d), and §§ 404.1569, 416.969 among other things. The ALJ will consider a claimant disabled if she cannot perform her past work or other work in the national economy. 20 C.F.R. §§ 404.1505(a), 416.905(a).

Based on physical impairments, the ALJ must first determine the type of work the claimant has the RFC to perform taking into consideration her age, education, and work experience. Williams v. Bowen, 844 F.2d 748, 751–52 (10th Cir. 1988). SSA regulations define the types of work as sedentary, light, medium, heavy, or very heavy. 20 C.F.R. §§ 404.1567, 416.967.

Here, the ALJ found Ms. Black had the RFC to perform sedentary work except that she could lift/carry/push/pull with only her left hand, and could only occasionally handle and finger with the right hand. (Tr. 25.) Further, he "limited [Ms. Black] to simple, routine, and repetitive tasks," "in a work environment free of fast-paced production requirements," "involving only simple, work-related decisions," and "only occasional interaction with the public." (Id.) The ALJ also noted that she would have an average of two unscheduled absences from work per month. (Id.) Based on this RFC and Ms. Black's age (30 years old) and education (high school and ability to communicate in English), the ALJ concluded that jobs in the national economy exist in significant numbers that she could perform. (Tr. 34.) Specifically, the ALJ found Ms. Black could perform the requirements of a surveillance-system monitor (Dictionary of Occupational Titles ("DOT") Code 379.367-010) and that, given her RFC, Ms. Black could perform approximately 15,000 available jobs in the national economy. (Id.)

Ms. Black takes issue with a number of aspects of the ALJ's analysis at step five.

She argued in her opening brief that the ALJ erred in finding she could perform the job

of a surveillance-system monitor because it has a General Education Development

(GED) reasoning level of three, which she claimed conflicts with the ALJ's RFC limiting

her to "simple, routine, and repetitive tasks." (ECF No. 16 at 24–25.) Ms. Black

withdrew that argument in her reply. (ECF No. 21 at 9 ("The plaintiff withdraws her

argument as to reasoning levels . . .").  Therefore, the undersigned will not address it.

The undersigned addresses the remaining arguments in turn.

### A.    VE Qualifications

In her opening brief, Ms. Black argues that the VE does not have adequate

experience because he has not placed anyone in a job in twenty years and had not

analyzed the surveillance-system monitor position in five years. (ECF No. 16 at 25.)

She also asserts that the VE did not meet the criteria for a vocational expert set forth in

the Vocational Expert Handbook.  (Id.)  As Ms. Black points out, the ALJ indicated in his

decision that he considered Ms. Black's "argument challenging the reliability of the

vocational expert's testimony and f[ou]nd it to be without merit." (Tr. 36.)  She argues

that the ALJ erred because he did not discuss the VE's experience or the handbook in

his decision. (ECF No. 16 at 25.)  The Commissioner counters that the handbook "is

not a recitation of the agency's criteria for vocational experts—rather, it is orientation

materials for newly rostered vocational experts, providing information about the

disability adjudication process." (ECF No. 18 at 25.)  The Commissioner also cites to

the portions of the record that outline the VE's qualifications and experience.  (Id. at 25–

26.)  On reply, Ms. Black reiterates her argument and further states that the VE stood

on his experience when testifying that the DOT description for the surveillance-system monitor position "was no longer accurate" and that he did not know if the job as it now exists requires the detaining of individuals.  (ECF No. 21 at 9.)  The undersigned agrees with the Commissioner.

As an initial matter, Ms. Black misconstrues portions of the VE's testimony relating to the DOT job description for the surveillance-system monitor position and his response concerning the detention of individuals.  At the hearing, the ALJ asked the VE to consider a hypothetical individual with Ms. Black's RFC, except for the limitation that the individual would have two unexcused absences per month.  (Tr. 76–77.)  The VE testified that an individual with these limitations could perform only the surveillance-system monitor job of those jobs available in the national economy.  (Tr. 76–78.)  The VE noted that around 30,000 such jobs exist in the national economy.  (Tr. 77.)  The ALJ then asked the VE if his testimony with respect to this hypothetical conflicted with the DOT.  (Tr. 78.)  The VE responded that based on his research and observation, this position has grown from the government sector, as listed in the DOT, to the private sector.  (Id.)   The ALJ then asked the VE if a hypothetical person with the same limitations having an average of two unscheduled absences per month could perform the surveillance-system monitor job.  (Tr. 80.)  The VE answered affirmatively but testified that given the unscheduled absences, the number of jobs would decrease by 25 to 50 percent.  (Id.)  The ALJ then asked the VE if his testimony with respect to this hypothetical conflicted with the DOT.  (Id.)  The VE responded that it was not reflected in the DOT and was based on his observation, background, and training.  (Id.) Furthermore, when asked if individuals in the surveillance-system monitor position

sometimes have to detain individuals, he said "not to my knowledge," and that "they

may . . . [b]ut I'm not aware of that."  (Tr. 85.)

In any event, as the Commissioner points out, and Ms. Black appears to concede

in her reply, the Vocational Expert Handbook does not set out a list of requirements for

VEs—it consists of orientation materials for new vocational experts.[9]  Thus, Ms. Black's

argument that the ALJ cannot rely on the VE's testimony because he does not meet the

handbook criteria lacks merit.  Furthermore, the SSA's Hearings, Appeals, and Litigation

Law Manual (HALLEX) states, "[g]enerally, the Office of Disability Adjudication and

Review's regional office (RO) determines whether a person meets the qualifications to

perform the functions of a [vocational expert]" based "overall education and

experience."[10]  The Commissioner cites to the VE's qualifications contained in the

record.  (ECF No. 18 at 25–26.)  Among other things, she notes that the VE, Richard

Taylor, has a doctorate in counseling, extensive experience providing vocational

services (counseling and job placement) to individuals with disabilities, and twenty years

of experience in providing vocational expert testimony in social security disability cases.

---

[9] See Vocational Expert Handbook, available at:
https://www.ssa.gov/appeals/public_experts/Vocational_Experts_(VE)_Handbook-
508.pdf (last accessed Mar. 6, 2018) ("Thank you for becoming a vocational expert (VE)
for the Office of Hearings Operations (OHO).  This handbook provides the basic
information you will need when you participate in administrative law judge (ALJ)
hearings.  The handbook explains Social Security's disability programs, the appeals
process we use, your role and responsibilities, and technical information you must
know.").  Further, contrary to Ms. Black's argument, the handbook does not require VEs
to have "current and extensive experience in the placement of handicapped individuals."
(ECF No. 16 at 25.)  Instead, the handbook states:  "While not a definitive list of job
requirements, an ideal VE will have . . . Involvement in or knowledge of vocational
counseling and the job placement of adult, handicapped workers into jobs."  Vocational
Expert Handbook at 8.

[10] See HALLEX I-2-1-31(B), available at https://www.ssa.gov/OP_Home/hallex/I-02/I-2-
1-31.html (last accessed Mar. 6, 2018).

(Tr. 81, 505–07.)  Furthermore, the Tenth Circuit allows the ALJ to rely on the VE's experience as evidence to explain discrepancies between the VE's testimony and the DOT.  Rogers v. Astrue, 312 F. App'x 138, 141-42 (10th Cir. 2009) (unpublished).

Ms. Black does not cite to any case law or authority requiring a VE to have placed disabled individuals in jobs a certain number of years prior to his testimony or analyzed the specific job at issue in his testimony a certain time period before testifying.  Moreover, she fails to cite any case law that would require the ALJ to discuss specifically the VE's qualifications and expertise in his decision.  The ALJ did, however, ask the VE about his training, background, and experience at the hearing.  (Tr. 80–81.)  Further, no evidence exists in the record suggesting that the VE—who has provided vocational expert testimony in social security disability cases for decades—is not qualified.  Accordingly, the undersigned finds no error in the ALJ's decision relating to the expertise, qualifications, and reliability of the VE.

## B.    Significant Number of Jobs

In her opening brief, Ms. Black argues that the ALJ failed to analyze whether the 15,000 surveillance-system monitor jobs the VE found available to Ms. Black in the national economy constituted a "significant number."  (ECF No. 16 at 25.)  Ms. Black contends the ALJ did not perform the analysis required by the Tenth Circuit's decision in Trimiar v. Sullivan, 966 F.2d 1326 (10th Cir. 1992).  The Commissioner countered that Trimiar does not apply in this case and that the Tenth Circuit has "implied that as few as 11,000 jobs was a significant number."  (ECF No. 18 at 24.)  Ms. Black argues in her reply that she "modifies her argument as to job numbers as part of the reliability argument, but still argues that the Trimiar analysis should occur."  (ECF No. 21 at 9.)

She claims that in light of the Commissioner's argument that 11,000 jobs reflects an adequate number and the VE's statement that 15,000 surveillance-system monitor jobs exist in the national economy, that the "reliability of the VE's testimony is critical."  (Id.)

In Trimiar, the Tenth Circuit stated it "has never drawn a bright line establishing the number of jobs necessary to constitute a 'significant number[.]'"  966 F.2d at 1330. But the court pointed out "that several factors go into the proper evaluation" of what constitutes a significant number:

> A judge should consider many criteria in determining whether work exists in significant numbers, some of which might include:  the level of claimant's disability; the reliability of the vocational expert's testimony; the distance claimant is capable of [traveling] to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on.

Id. (quoting Jenkins v. Bowen, 861 F.2d 1083, 1087 (8th Cir. 1988)).

In Raymond v. Astrue, the Tenth Circuit rejected a social security claimant's argument that Trimiar requires ALJs to engage "in a multi-factor analysis to assess whether there are significant jobs in the regional economy."  356 F. App'x 173, 178 n. 2 (10th Cir. 2009) (unpublished).  The court explained its reasoning as follows:

> Like our other cases, the court in Trimiar indicated that the relevant test is either jobs in the regional economy or jobs in the national economy. [Trimiar, 966 F.2d] at 1330–32.  In Trimiar the focus was on jobs in the regional economy because the vocational expert in that case testified only to the number of available jobs in the regional economy.  Because the number of such jobs was between 650 and 900, and because this circuit has "never drawn a bright line establishing the number of jobs necessary to constitute a 'significant number,' " the court turned to the multi-factor analysis to help it resolve the question whether 650 to 900 jobs is a "significant" number.  See id. at 1330.  Trimiar does not hold that only regional jobs are relevant or that a court must engage in a factoral analysis when the number of jobs [nationally] available is, as here (1.34 million), much larger.

Id. (emphasis in original); see also Evans v. Colvin, 640 F. App'x 731, 736 (10th Cir. 2016) (unpublished) ("[Plaintiff] suggests the ALJ must perform a similar factoral analysis with regard to the remaining 18,831 jobs. . . . Where, however, the number of jobs is 'much larger' than the 650–900 at issue in Trimiar, no factoral analysis is required.")

The undersigned agrees with the Commissioner that the ALJ did not have to engage in a factoral analysis under Trimiar because the 15,000 national jobs available to Ms. Black exceeds the 650 to 900 regional jobs available in Trimiar.  As the Commissioner points out, the Tenth Circuit has implied that 11,000 jobs available nationally constitutes a "significant number."  See Evans, 640 F. App'x at 735 (stating that in Rogers, 312 F. App'x at 142, the Tenth Circuit "implied that 11,000 national jobs was a significant number").  In addition, the District of Colorado found 11,400 national jobs a significant number.  See Wamsley v. Astrue, 780 F. Supp. 2d 1180, 1193 (D. Colo. 2011) (finding "no error in the ALJ's determination that a significant number of jobs exist in the national economy").  Thus, the undersigned finds no error in the ALJ's determination that a significant number of jobs exists in the national economy that Ms. Black could perform.

Ms. Black asserts a number of new arguments in her reply—that during the hearing the VE failed to give a specific number of full-time jobs for the surveillance-system monitor position, that the requirements of the surveillance-system monitor job conflict with the ALJ's hypothetical to the VE, and that the DOT does not contain information on which to base job numbers.  (ECF No. 21 at 9–10.)  As Ms. Black did not make these arguments in her opening brief, she waived them, and the undersigned will

not consider them.  See, e.g., Harrell, 642 F.3d at 918.  Furthermore, Ms. Black makes conclusory arguments on these points and does not explain how these alleged errors influenced the ALJ's decision.

## RECOMMENDATION

For the reasons set forth above, the undersigned RECOMMENDS the District Judge REMAND the Commissioner's decision.

The Court will send copies of this Report and Recommendation to the parties and hereby notifies them of their right to object to the same.  The Court further notifies the parties that they must file any objection to this Report and Recommendation with the Clerk of the Court,  pursuant to 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b), within fourteen (14) days of service thereof.  Failure to file objections may constitute waiver of objections upon subsequent review.

DATED this 7th day of March, 2018.


BY THE COURT:


_____
EVELYN J. FURSE
United States Magistrate Judge